**PIERCE OIL CORPORATION v. SCHACHT et al.**

No. 9480—Opinion Filed May 13, 1919.

Rehearing Denied June 24, 1919.

(Syllabus by the Court.)

1. **Oil and Gas—Lease—Construction of Departmental Lease—Effect of Sale of Subdivisions—Extension by Drilling Well.**

Where a departmental oil and gas lease upon 160 acres of land has been approved by the Department of Interior, and thereafter the lessor has divided said land into subdivisions and sold separate subdivisions to different parties, after the restrictions are removed, and the lessee enters into a written contract with the owners of the premises that the depository for the payment of the oil and gas rentals and royalties is changed from the place provided in said lease to places designated by the different landowners, this fact does not make the lease a separate lease upon each tract of land, but the same remains a lease upon the entire tract of land, and the drilling of a gas well upon any portion thereof and the payment of the royalty on the gas well as provided in the lease to the owner of the portion of the land where said gas well is found extends the life of the lease upon the entire tract of land.

2. **Same—Transfer of Land Subject to Lease—Royalties.**

Where a tract of land subject to an oil and gas lease is transferred to different parties, the purchaser of each portion takes the same subject to such lease; and, should the lessee thereafter discover and produce oil or gas from the leased premises, the purchaser is entitled to the royalties accruing from the oil and gas produced on the portion of the premises owned by him.

3. **Oil and Gas—Lease—Forfeiture—Notice.**

Where a departmental oil and gas lease provides, if the lessee fails to comply with any of the terms thereof, that the lessor may declare the lease forfeited upon giving ten days' notice, the notice is not complied with by the lessor notifying the lessee that he has declared the lease forfeited, but in order to comply with said provision in said lease, it is necessary to notify the lessee of the terms of the lease that have been violated, and that, if the same is not complied with within ten days, then the lease will be considered forfeited.

4. **Same—Cancellation—Laches.**

A lessor, invoking the jurisdiction of a court of equity to cancel and rescind an oil and gas lease for breach of one of the covenants, must act with reasonable dispatch after the discovery of his rights to forfeiture on account of such breach, and if he claims delay rental and advance royalty due June 19, 1910, in the sum of $52, but he permits the lessee to take charge of the premises in September, 1910, and drill a gas well upon a portion of the premises covered by said lease, and permits the lessee to pay the royalty due under said lease to the owner of the portion of the land where the gas well is found, for a period of three years, and permits the premises to be sold, and the record title shows that said lease is in full force and effect, and thereafter the lessee takes possession of said portion of the premises belonging to the lessor, although over his protest, but without any proceedings, and drills three producing oil wells thereon at a cost of $19,000, and tenders to the lessor the royalty due under said leases said plaintiff would be guilty of laches, and a court of equity would not enforce a forfeiture for the nonpayment of $52 rental due June 19, 1910, especially where there is a controversy over the question of said rental being due.

Error from District Court, Okmulgee County; Ernest B. Hughes, Judge.

Suit by William H. Schacht and others against the Pierce Oil Corporation. Judgment for plaintiffs, and defendant appeals. Reversed and remanded, with instructions to grant defendant a new trial.

Rice & Lyons, for plaintiff in error.

G. R. Horner and C. B. McCrory, for defendants in error.

McNEILL, J. This controversy arose by William H. Schacht et al. filing suit to cancel a lease on the southeast quarter of the southwest quarter of section 15, township 13 north of range 14 east, containing 40 acres, which said lease was owned by Pierce Oil Corporation, which company was in possession of and developing the same at time of bringing suit. For convenience, William H. Schacht et al. will be referred to as the plaintiffs and Pierce Oil Corporation as the defendant, being the position they occupied in the court below.

The facts are, substantially, that Lee Doyle, a mixed-blood Creek Indian, received as his allotment the southwest quarter of section 15, township 13, north, range 14 east, Okmulgee county, containing 160 acres. That on the 19th day of February, 1907, he executed an oil and gas lease, being a departmental oil and gas lease, to the Tulsa Fuel & Manufacturing Company, and the same was approved June 19, 1907, by the Secretary of Interior. The form of the lease is what is known as a regular departmental oil and gas lease. On April 5, 1909, Lee Doyle sold the southeast 40 of said quarter section to I. H. Cox, who on the 12th day of June, 1909, transferred the same to William H. Schacht and his brother.

That after the execution and approval of the lease in question said Lee Doyle trans-

ferred the other 120 acres to J. W. Adair et al. That after Lee Doyle sold the 120 acres to J. W. Adair et al., an agreement was entered into between J. W. Adair et al. and Tulsa Fuel & Manufacturing Company which changed the place of payment of all rentals and royalties due under said lease from the Union Agency Department of Interior, Muskogee, Okla., to Quincy National Bank of Quincy, Ill., and that on the 25th day of November, 1908, William H. Schacht et al., entered into the same kind of an agreement with Tulsa Fuel & Manufacturing Company, changing the place of payment of royalties and rentals to the First National Bank of Morris, Okla.

That thereafter said lease was transferred, and again on September 22, 1910, the said lease was assigned to L. S. Skelton. That L. S. Skelton during the year 1910 entered on the premises and drilled a gas well on the portion of the land belonging to the Adairs et al., and found gas in paying quantities. He paid the gas rentals due from the producing gas well to Adair et al. according to the terms of the lease. The lease contained the provision that if gas was produced from said premises at the end of the year, the lessee should pay $150 from each gas-producing well. The lease further provided for an annual royalty of 15 cents per acre, in advance for the first and second years, and 30 cents per annum in advance for the third and fourth years, and 75 cents per acre per annum in advance for the fifth year and further provided, should the party of the second part neglect or refuse to pay said advance royalty and rental for a period of 60 days after the same became due and payable, the Secretary of Interior, after ten days' notice to the parties, might declare the lease null and void. The lease further provided that the well should be drilled within 12 months from the date of the approval of the bond by the Secretary of Interior, or, refusing to drill one well within the time stated, the lease might, in the discretion of the Secretary of Interior, become null and void after ten days' notice to the parties, provided that the lessee should have the privilege of delaying operations for a period of not exceeding five years from the date of the approval of the bond to be furnished in connection therewith, by paying in addition to the advance royalty the sum of $1 per acre per annum for each leased tract remaining undeveloped. The lease further contained the provision that if the lessee violated any of the stipulations or failed for 60 days to pay the royalties, the Secretary of the Interior, after ten days' notice to the parties thereto, should have the right to avoid the lease and cancel the same, when all the rights, franchises, and privileges of the lessee, or assigns, thereunder should cease and end, without resorting to the courts and without further proceedings, and the lessor should be entitled to immediate possession of the leased land and the permanent improvements thereon.

That after L. S. Skelton took possession of said premises he paid the royalties due under the terms of said lease from the producing gas well. This was paid direct to the Adairs et al., and Skelton operated said gas well on said premises, and connected pipes on and across said premises to said well.

On March 21, 1913, Skelton assigned said lease to Waters-Pierce Oil Company, and on July 7, 1913, Waters-Pierce Oil Company assigned said lease to the Pierce Oil Corporation.

The plaintiffs' suit was brought for the purpose of canceling the lease, on the theory that the defendant never paid the rentals and advance royalties falling due in June, 1910, 1911, 1912, and 1913, on this particular 40. The defendant answered that it was an innocent purchaser; that Skelton was in possession of the premises, operating the same for oil and gas purposes at the time of purchase; that the record title was clear, and it paid a valuable consideration therefor, and in addition to the gas well drilled by Skelton in 1910, the defendant in June, 1913, drilled its first well, which produced oil in paying quantities; that it had drilled three wells on this particular 40 acres of land; that at the time of the trial it had expended about $19,000, and received about $16,000 in return. It had tendered to the plaintiffs the one-tenth, being amount provided in lease, of all oil received, and offered to do equity.

The facts further disclosed that prior to drilling said wells, to wit, in May, 1913, the defendant sent what is known as a division order to the plaintiffs, informing them it expected to drill said wells, and asked them to sign the same. This plaintiffs refused to execute. There was some controversy over this question, but the defendant went ahead and drilled said wells.

In the latter part of December, 1911, the plaintiffs wrote a letter to L. S. Skelton, informing him that he had failed to pay the rentals and royalties due on this 40 acres, and they declared the lease null and void. In January, 1912, Skelton replied, stating that he had complied with the terms of the lease. On January 10, 1912, the plaintiffs again wrote to Skelton, stating that the rentals and royalties had not been paid on this

40 acres, and they declared the lease null and void.

On trial of the case, the court found the issues in favor of the plaintiffs, and against the defendant, canceling the lease, and by a subsequent motion the court attempted to adjust the damages and to award to the plaintiffs, all of the material and equipment on said lease, but this award was afterwards set aside, and is not before this court at this time.

The case is now before this court upon the judgment of the court canceling said lease. The first finding of which defendant complains is as follows:

"That the leasehold estate covering the 40-acre homestead allotment, belonging to the plaintiffs and involved in this action, became effectually severed from the leasehold estate, covering the surplus allotment which had been sold to other parties, when the owner of the oil and gas lease in controversy paid to the owners of each of said tracts their proportionate benefits accruing thereunder in accordance with separate stipulations theretofore made with each of them, to which finding the defendant excepts."

In making this finding the court committed error. This lease embraced 160 acres of land, and was not a lease on any tracts or subdivisions of the same. There was no agreement that the lease should be considered as a separate lease as to each landowner. The contract or agreement entered into with the parties only provided that the portion of the rentals or royalties belonging to each party might be paid into certain banks, instead of the Union Agency, at Muskogee, which was made a depository by the lease. The United States released all interest in the premises by reason of restrictions being removed from the land and the land being sold. It was then agreed by all of the parties that whatever rentals and royalties might be due under the lease should be paid at a different place. This in no wise changed the form of the lease, but only provided for the place of payment. This added no new burdens to the lessee, changed none of the rights and liabilities of the lessee and the plaintiffs acquired no new rights by reason of changing the depository. The plaintiffs, having become the owner of 40 acres of said premises, became entitled to whatever delay money in the nature of rentals or advance royalties were due for their portion of the premises, but as soon as the said premises were developed and oil or gas produced in paying quantities, then they were not entitled to receive any of the royalties received from either of the gas or oil wells, unless the same were upon their premises, nor were they entitled to receive any rentals or advance royalty thereafter, for none would be due or payable under the lease. This was decided by this court in the case of Kimbley v. Luckey et al., 72 Oklahoma, 179 Pac. 928. Justice Sharp, speaking for the court, said:

"Where an oil and gas lease is made to extend to the heirs, administrators, and assigns of both lessor and lessee, and before the discovery and production of oil and gas thereon a third party purchases a portion of the leased premises, each owner is ordinarily entitled to the profits and royalties arising and accruing from the oil and gas produced on his tract, free of any claim or demand of the other."

"Where a tract of land subject to an oil and gas lease is subdivided by the owner and lessor by selling a portion thereof, the purchaser of such portion takes the same subject to such lease; and, should the lessee therein thereafter discover and produce oil or gas from the residue of the leased premises, such purchaser is not entitled to an apportionment or share of the royalties accruing from the oil and gas produced thereon."

This rule is supported by the case of Northwestern Ohio Natural Gas Co. v. Ullery, 68 Ohio St. 259, 67 N. E. 494; Osborn v. Arkansas Territorial Oil & Gas Co., 103 Ark. 175, 146 S. W. 122; Fairbanks v. Warrum, 56 Ind. App. 337, 104 N. E. 983, 1141.

Upon this theory, after Skelton had produced a gas well on said premises in 1910 and paid the stipulated royalties thereon as provided in said lease for a gas well, the lease providing the annual advance royalty should be credited upon the stipulated royalty, and the stipulated royalty being more than the annual advance royalty, then and from that time on there would be no indebtedness for future rentals due from that time on. This would not only apply to the portion of the land, where the gas well is situated, but to the land in its entirety, and the payment of said stipulated royalties continued the lease in force and effect as to the entire 160 acres of land. It is necessary to keep in mind and distinguish the difference between stipulated royalties, advance royalties, and the term rentals, or delay money. It was admitted or agreed that all of the rentals and advance royalties were paid to June 19, 1910. The defendant claims that Skelton paid the same from June 19, 1910, to June 19, 1911. It was uncontradicted that during the year 1910, as provided by said lease, Skelton paid the stipulated royalties on the gas well. This was paid also in the years 1911, 1912, andd 1913, and after the oil well in 1913 was drilled, the defendant in this case tendered to the plaintiffs the one-tenth of the oil produced from said premises, being the stip-

ulated royalty. There could be nothing due on this lease, unless it was the rentals and advance royalties that became due the 19th day of June, 1910, and as to this 40 acres would only amount to $52 under the terms of the lease.

The lease provides that upon ten days' notice the lessor may declare a forfeiture when the lessee does not comply with the terms of the lease, and provides how the same may be forfeited. If the plaintiffs had desired to exercise the forfeiture in said lease for non-payment of the advance royalty and rental, they could have given ten days' notice, notifying the lessee in possession that there was so much rental due, and that upon the failure to pay the same in ten days the lease would be declared forfeited. This they did not do, but permitted the lessee to take possession and develop the premises, and permitted the lessee, according to the uncontradicted testimony, to keep possession, drill a gas well, and to pay at least two years' stipulated royalty that was due on the gas well, as provided in said lease, before ever claiming any rental due. At that time they failed to give any notice that rentals were due, and if not paid within ten days, as provided by the terms of said lease, that the lease would be declared forfeited, but notified the lessee that they had declared the lease forfited, which was declaring a forfeiture without a notice, and contrary to the terms of the lease. This they could not do. They were notified that the lessee claimed that he had complied with the terms of the lease; still they permitted him to retain possession under the lease and produce gas therefrom, permitted the records to remain clear, permitted the lessee who was in possession to sell and dispose of the leased premises, and did not attempt to quiet title until January, 1914. This, after the defendant had taken possession and drilled three oil wells on the premises and expended $19,000.

This court, in the case of Indiana Oil, Gas & Development Co. v. McCrory, 42 Okla. 136, 140 Pac. 610, laid down the following rule:

"A lessor invoking the jurisdiction of a court of equity to cancel and rescind a lease for breach of an implied covenant must come into court with 'clean hands,' and must act with reasonable diligence after the discovery of his right to the forfeiture on account of such breach."

Again, in the case of Wellsville Oil Co. v. Miller, 44 Okla. 493, 145 Pac. 344, the court quotes with approval from Judge Sanborn in the Michigan Pipe Co. Case, 111, Fed. 284, 49 C. C. A. 324, as follows:

"A suit in equity is an appeal for relief to the moral sense of the chancellor. A court of equity is the forum of conscience. Nothing but good faith, the obligation of duty, and reasonable diligence will move it to action. Its decree is the exercise of discretion; not of an arbitrary and fickle will, but of a wise judicial discretion, controlled and guided by the established rules and principles of equity jurisprudence."

In the case at bar, the stipulated royalties for the years of 1911, 1912, and 1913, were paid as provided in said lease. During the year 1910 the stipulated royalties on the gas well were paid, but there is only one controversy in this case—the question whether $52 due June 19, 1910, was paid or not. Can a person who claims an advanced royalty and rental amounting to $52 due June 19, 1910, permit an assignee of the lessee to go in possession in September, 1910, and drill a gas well and develop the premises, pay the stipulated royalties due from the gas well in 1910, pay the same in the year 1911, and then notify the lessee that he claims the lease forfeited, and when a controversy arises, and he is informed that the lessee claims that he has paid all the advance royalties and rentals as provided by said lease, then permit the lessee to remain in possession during the year 1912, permit him to sell the lease in 1913, while in possession, sit idly by in 1913 and permit three oil wells to be drilled upon his portion of the premises, then ask a court of equity to declare the lease forfeited by reason of claiming $52, which amount is in controversy, and if due at all, was due June 19, 1910?

This is neither equitable nor just, and the plaintiffs would be guilty of such laches as would prevent a court of equity from enforcing a forfeiture, especially in a case where the lessee offers to do equity. The plaintiffs are guilty of such laches as would prevent them from recovering, and the further fact that no notice was given before attempting to declare a forfeiture as provided in said lease is to be considered.

The plaintiffs rely upon the case of Guffey Petro. Co. v. Jeff Chaison Town-Site Co., 48 Tex. Civ. App. 555, 107 S. W. 609, on the question of separation of leases, but we do not think that case is in point. That case was an action for damages, where the lease covered a tract of land and the same was partitioned, and the lessee would not drill the portion of the land owned by one landowner. The suit was for damages for the reason the lessee failed to protect the line, or the portion of land owned by the plaintiff in that case, and was draining the oil and gas from thereunder. No such question as that arises in the case at bar, but this court reserved the right to say what it would do in a case of that kind and character in the case of Kimbley v. Luckey, supra.

The evidence in the case at bar is exactly contrary to the Guffey Case, for the reason the evidence disclosed in the case at bar that the oil wells were drilled upon this plaintiffs' land, and there was no contention that their premises were being drained. This lease being a lease upon the whole 160 acres of land. the only controversy in dispute that can arise is over the question of whether there is due $52; and, the plaintiffs having waited three and one-half years before attempting to enforce their rights, and after the defendant had expended $19,000 and produced oil and gas in paying quantities, it must be admitted that the plaintiffs have been guilty of such laches as to waive their rights to declare a forfeiture upon this ground, also have failed to give the proper notice as provided by the terms of the lease, and their remedy would be for a judgment for the amount of rental and advance royalties found due, if any.

The case is therefore reversed and remanded, with instructions to grant the defendant a new trial.

SHARP, C. J., and RAINEY, HARRISON, PITCHFORD, and JOHNSON, JJ., concur.