**COLINE OIL Co. v. CANNON, Trustee, et al.**

No. 18321. Opinion Filed Jan. 21, 1930.

Dissenting Opinions Filed May 20 and July 8, 1930.

Rehearing Denied July 8, 1930.

Commissioners' Opinion, Division No. 1.

Rainey Flynn, Green & Anderson, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter and Moore & West, for defendants in error.

TEEHEE, C. In our consideration of this cause, we will refer to the defendants in error, Hal M. Cannon, trustee of the estate of J. S. Mullen, bankrupt, and W. M. Bonner, plaintiff and intervener, respectively, in the trial court, as plaintiffs, and plaintiff in error, the Coline Oil Company, as defendant, or by name, as the case may be. The cause was one to quiet the title to certain lands of the bankrupt estate acquired by Bonner, against an oil and gas lease thereon held by defendant.

Clarity of the matters for our decision first requires our references to the transactions giving rise to the case, to wit:

On July 30, 1913, J. R. Cottingham was the title holder of 1,940 acres of land situated in Carter county, and on that date he leased the same for oil and gas purposes

to W. E. Hodges, the terms of which will hereinafter be noticed.

On May 24, 1915, Cottingham conveyed to J. S. Mullen 1,300 acres of the original tract subject to the lease thereon held by Hodges, hereinafter referred to as the Mullen tract. On November 17, 1915, the remainder of the land, 640 acres, was conveyed by Cottingham to the Coline Oil Company, which was also subject to the Hodges' lease. On March 8, 1916, Hodges, the lessee, assigned the lease covering the original tract of 1,940 acres to the Coline Oil Company. This being unrecorded, another assignment on March 8, 1920, was executed.

On November 13, 1922, Mullen was adjudged a bankrupt, with Cannon appointed as trustee of the bankrupt estate, who was, on July 12, 1924, by the bankruptcy court, duly authorized to bring this action. The suit was filed on July 15, 1924. Subsequent to the filing of the action, the Mullen tract was purchased by Bonner at a judicial sale of the property, who thereupon, by intervention, became the real party plaintiff in interest.

By suitable pleadings by the parties, both issues of law and fact were framed, which went to the right of defendant to hold the leasehold estate, the validity of the lease contract, severance of the lease as to the Mullen tract by extinguishment of the leasehold as to the fee acreage acquired by defendant by merger upon assignment of the lease to defendant, termination, and abandonment of the lease as respecting the Mullen tract, and trespass by the defendant upon the Mullen tract subsequent to termination of the lease resultant in damages to plaintiff Bonner through unauthorized extraction of oil and gas from the premises.

The cause being tried to the court, all issues of law and fact were in general terms found against defendant, and thereupon judgment was rendered quieting the title to the Mullen tract in plaintiff Bonner, and decreeing an accounting against the defendant for the oil and gas produced therefrom, which phase, by agreement of the parties, has been reserved for settlement following appellate action on this appeal.

The parties have forcefully presented a number of propositions for and against the judgment, several of which raise the general question of whether or not the lease as to the Mullen tract had terminated prior to the institution of the suit, if the lease on defendant's fee acreage was extinguished as alleged by plaintiffs. Affirmative conclusion in these premises will dispose of the cause on appeal without consideration of the other questions raised.

The general question requires our notice of the terms of the lease contract relevant thereto, and our consideration as to whether or not the lease may have been affected by the acquisition of both the freehold and leasehold estates by defendant, and this well may be prefaced with the observation that, while defendant refers to the contract as a lease or mineral deed, we will proceed on the theory that it was a lease, as this was defendant's theory in the trial court. As noted, the lease was made on July 30, 1913. At the time of the execution, there were a number of producing oil wells on that part of the leased premises later conveyed by lessor to defendant. In its constituent elements, the lease is divided into three parts designated by article numeration.

Article 1 provided that the lands were leased to the lessee "for and in consideration of the payment of the sum of ($10.00) dollars, * * * and other good and valuable consideration, and of the performance by the lessee of the covenants hereinafter set forth to be performed by the lessee," and "to have and to hold the same from the date of the execution hereof for a period of ten years and as long thereafter as oil or gas may be found in paying quantities on said premises."

Article 2 dealt with the rights and privileges of the lessee. Thereunder ownership of all the wells then on the property passed to the lessee. As in ordinary leases there were provisions for ingress and egress and occupation of such parts of the surface necessary for the drilling and operation of wells, for derricks, gathering lines, and all other necessary equipment and machinery appurtenant and incident to the operation of a developed and productive leasehold, which provisions clearly indicated the intention of the parties that the leasehold should be further developed by the drilling of other wells though no shorter time than the ten-year period was fixed within which such new development should be commenced.

Article 3 related to other uses of the premises; provided for the payment of taxes by the lessee during the life of the lease which may be levied on improvements placed on the leasehold; nonliability of the lessee for damages resultant from the development and operation of the property for the purposes of the lease; that lessee was not required to maintain continuous production or operation, and that the leasehold should

not be considered abandoned "unless the lessee shall have ceased to operate hereunder as to all of the wells then in existence for an unbroken period of two years at any one time, and the drilling of additional wells shall extend the lease for an equal period;" removal of all property placed on the premises by lessee upon the expiration of the lease "by limitation or abandonment or whenever the lessee shall conclude that oil or gas cannot thereafter be found in paying quantities on any of the above-described premises, or any part thereof," and that:

'If the lessor shall in the future sell and transfer any of the above-described premises, the terms and conditions of this lease, and each and every part thereof, shall run with such part of such land so transferred, and be binding upon the grantees therein named."

It is to be observed that the lessee did not provide for the payment of any royalty to the lessor, nor any rental postponement of the drilling wells within the ten-year period, as is usually the case in this class of contracts.

So far as the record discloses, there were no producing wells drilled on any part of the lease during the ten-year period. One nonproductive well was drilled on the Mullen tract within that period. Three producing wells were drilled on the Mullen tract subsequent to the expiration of the primary term. At that time paying quantities of oil were being produced from the fee acreage acquired by defendant in 1915. In defendant's gross production reports to the State Auditor, both prior and subsequent to the expiration of the primary term, it was stated that the wells on that part of the property defendant had acquired by deed in 1915, were being operated by it as owner of the land.

This state of facts defendant contends shows that the lease did not terminate upon the expiration of the primary term on July 30, 1923, and continued thereafter under the extension provision from the fact that oil and gas were being produced in paying quantities under and by virtue of the lease. Plaintiffs' contend that upon acquisition by defendant of the freehold and the leasehold, the lease was extinguished as to that part of the leasehold covered by the Cottingham deed of November 17, 1915, by merger of the lesser title with the greater which operated to constitute the Mullen tract as a separate lease, and that as the defendant did not by development render the Mullen tract productive of oil or gas in paying quantities before the expiration of the ten-year period on July 30, 1923, the lease on that date terminated, and the fact that defendant subsequently entered thereupon without plaintiff's knowledge or consent, and by development rendered the same productive of oil and gas in paying quantities, did not operate as a revival of such lease.

The doctrine of merger of estates is a common-law rule, and has been well defined in Boykin v. Ancrum, 28 S. C. 486, 6 S. E. 305, 13 Am. St. Rep. 698, to be

"the annihilation of one estate in another. It takes place usually when a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, whereby the less is immediately merged; that is, sunk or drowned in the greater."

Of merger, in respect to a tenancy for years, in 2 Taylor's Landlord and Tenant (9th Ed.) 97, par. 502, the author says:

"Another means of dissolving the relation of landlord and tenant is by an operation of law, called a merger; which follows whenever two or more distinct estates in the same lands are found to meet in the same person, without any intermediate estate. As, when a tenant for life, or for a term of years, purchases the fee, or the fee descends to him as heir-at-law; in either case, the lease is extinguished or merged in the inheritance, since there would be a manifest inconsistency in allowing a person to have two distinct estates, immediately expectant on each other, while one of them includes the time of both, thus uniting the different characters of landlord and tenant in the same person."

In 1 Tiffany's Landlord and Tenant, 87, sec. 12, subd. "G," it is said:

"Such premature termination of the tenancy may be conveniently termed 'destruction' thereof as distinguished from its 'expiration' in accordance with the intention of the parties as expressed at the time of the making of the lease,"

—and that this may result

"by the voluntary concurrent action of the landlord and tenant, the voluntary action of one of them, or the action of the law without reference to their desire or intention."

Like announcement of the doctrine is made in 1 Washburn on Real Property (6th Ed.) 456, sec. 740; Tiedman on Real Property, 131, sec. 197. Many cases by these authors are cited illustrative of the principle in application, which, as are here pertinent, may be epitomized in the language of Shepard v. Spaulding (4 Metc.) 45 Mass. 416, to wit:

"Where a lessee for years conveys his leasehold interest to his lessor, who is owner of the fee, by an instrument in the form of the lease which he received from him, the legal operation of such instrument is a surrender of the lease, and a merger of the term."

The principle applies pro tanto, as was the case in Hill v. Reno, 112 Ill. 154, 54 Am. Rep. 222, where a lessee of an estate held in common purchased the fee in reversion of several of the cotenants, the court holding that such purchase to that extent operated as a merger of the term of the lease, and that as a consequence the covenant in the lease to pay rent, taxes, etc., were thereby extinguished as to the part of the reversion in fee purchased by the lessee. Following that application of the doctrine, in Higgins v. California Petroleum & Asphalt Co., 109 Cal. 304, 41 Pac. 1087, where two individual fee owners made a joint lease, and within the duration of the term of the lease, the lessee purchased the fee from one of the owners, it was held that the lease as to such part by merger was extinguished.

The doctrine of merger is recognized in respect to oil and gas leases. I Thornton's Law of Oil & Gas (4th Ed.) 206, sec. 69; Thuss, Texas Oil & Gas, 17, sec. 11.

From the foregoing, it is clear that the principle of merger of estates finds assertion where a leasehold title and a fee-simple title coincide and vest in a single person, as in the case at bar, on the theory that the owner of the estates cannot concurrently play the role of landlord and tenant. Being a principle of the common law, it constitutes a rule of action in this state. Section 170, C. O. S. 1921. In respect to a mineral lease, the principle finds legislative expression, as such a lease being in dignity a servitude (section 8429, C. O. S. 1921; First National Bank of Healdton v. Dunlap, 122 Okla. 288, 254 Pac. 729), vestment thereof and the servient tenement in the same person, by force of section 8438, C. O. S. 1921, extinguishes the servitude.

However, defendant urges upon us the rule that, unless it be the intention of the person in whom the different estates or realty interests unite, that merger should take place, equity will prevent merger where that result in some manner would operate to the disadvantage of such person, and contends that this is the situation here presented as merger would not only be to the disadvantage of defendant in respect to the remainder of the lease, but also that there was no evidence of intention that,

upon assignment of the lease to defendant, the same should coalesce with the freehold to that extent. The rule in relation to the question of disadvantage rests upon the principle of subrogation, and thus presupposes the existence of some right in equity in the unitee by virtue of the union that rightfully should be available in his protection as against an existent junior equity of another which would be rendered a senior equity if the other were merged. The rule has often been applied in cases where the equities called for its application, as where a purchaser of realty acquired by assignment a judgment lien in protection of the realty acquired from the judgment debtor, or as where a mortgagee acquired a senior mortgage, in which case the assigned would be kept alive where equity so required as to protect the interests of the lien assignee as against an intermediate lienholder. This it may be said is the gist of the relevant cases cited by defendant in support of the rule. And see Lashley v. Dexter, 133 Okla. 297, 272 Pac. 427.

Seemingly, defendant goes beyond this conception of the equitable rule in this relation, as a theory appears to be advanced that nonintention of merger alone is sufficient to prevent that result by force of the law, as the burden of his argument in that connection, and excerpts from cited cases in support thereof so indicates. If that in reality be defendants' theory, it must be denied, as certainly the individual fiat standing alone cannot be set up in contravention of the law of the case. The suggestion of such a theory carries with it the elements of its own destruction, for in application it would be subversive of the fundamentals of organized society whereunder the individual will is subordinated to the collective will which is symbolized by the law of the state.

At the time of the assignment of the lease to defendant, there was no intervening estate to stay the force of the law, nor was there any equity involved within the meaning of the equitable rule that may be said to have a like effect. If intention of merger be requisite to the operation of the law, which may be either express or implied (2 Kerr on Real Property, 1163, section 1292), proof thereof is to be found in the instrument of assignment which contained no provision for a reversion of the lease to assignor under any contingency, and in the operation by defendant of that part of the original leased premises conveyed to it by the Cottingham deed of November 17, 1915, as

owner of the property rather than as lessee.

We are of the opinion, therefore, that, as defendant was the owner of the fee simple title to the 640-acre tract covered by the Cottingham deed of November 17, 1915, at the time of the assignment of the lease by Hodges to defendant on March 8, 1916, the leasehold estate as to the 640-acre tract merged with defendant's fee-simple title thereto, and thereby to that extent the lease was extinguished, notwithstanding the provision of the lease that a sale or transfer of any part of the leased premises should carry with it the burden of the lease and be binding upon the grantee, as that provision by force of said section 8438, which, under a familiar principle, became a part of the contract, did not contemplate acquisition of the fee-simple title and the leasehold title by one and the same person, with the result that the lease continued as to the Mullen tract in respect to the terms thereof having particular application thereto. In other words, the lease stood unaffected by any provisions thereof that may be said to have had particular relation to that part of the original leased premises conveyed by the lessor in fee to defendant. This conclusion does not militate against the oft-repeated rule that courts will not make new contracts for parties, for here the situation is one that arose by operation of law upon the voluntary act of the parties.

In the situation thus brought about, it was clearly incumbent upon defendant, under the remaining terms of the lease, to have found oil or gas in paying quantities on the Mullen tract prior to the expiration of the ten-year period on July 30, 1923, in order to have continued in force the lease beyond that date and as long thereafter as oil or gas may be produced in such quantities. Roach v. Junction Oil & Gas Co., 72 Okla. 213, 179 Pac. 934; 1 Thornton's Law of Oil and Gas (4th Ed.) 415, sec. 148. This was undertaken about three years before the primary term expired with failure in production. No further effort was made until about July, 1924. The fact that defendant at that time entered upon the premises without the knowledge· and consent of plaintiffs and reduced to control and possession oil in paying quantities did not have the effect of itself to revive a leasehold interest in the premises. Zeigler v. Daily, 37 Ind. App. 240, 76 N. E. 819. There having been no successful development within the ten-year period, the lease contract, on July 30, 1923, automatically terminated. Pettitt v. Double-O Oil Co., 82 Okla. 13,

198 Pac. 616; Curtis v. Harris, 76 Okla. 226, 184 Pac. 574; McKinley v. Feagins, 82 Okla. 193, 198 Pac. 997. In these circumstances it was not error for the court to render judgment quieting plaintiffs' title to the property involved against defendant's claim of a subsisting oil and gas lease thereon, on the ground that the term of the lease had expired. Anthis v. Sullivan Oil & Gas Co., 83 Okla. 86, 203 Pac. 187.

The judgment of the district court is therefore affirmed.

By the Court: It is so ordered.

---

SWINDALL, J. (dissenting). On January 21, 1930, an opinion prepared by Mr. Commissioner Teehee, affirming the judgment of the trial court, was approved by this court and delivered in this cause. In due time, a petition for rehearing was filed, and upon further investigation of the facts and authorities cited in that opinion, I am unable to agree with the rule of law as herein announced and must dissent from the same.

The facts briefly stated are:

On July 30, 1913, J. R. Cottingham held the title to approximately 1,900 acres of land in Carter county, and on that date Cottingham executed and delivered to W. E. Hodges an oil and gas lease covering all of said lands. The lease was for a term of ten years and as long thereafter as oil or gas may be found in paying quantities "on said premises."

On May 24, 1915, Cottingham conveyed to J. S. Mullen, expressly subject to said lease, all of said lands, except 640 acres.

On November 17, 1915, Cottingham conveyed to Coline Oil Company (plaintiff in error), expressly subject to said lease, said remaining 640 acres.

On March 8, 1916, W. E. Hodges assigned said entire lease to Coline Oil Company.

Ever since prior to the execution of said lease oil has been produced in paying quantities from said 640 acres, and at the time of the trial in the lower court "30 wells were producing from said 640 acres."

At the time this action was filed, operations were in progress for the drilling of a well upon a portion of the land that had been conveyed to Mullen. That well and two additional wells have since been completed upon the Mullen acreage and all three wells have been producing oil in paying quantities.

This action was filed July 15, 1924, by Hal M. Cannon, as trustee of the estate of J. S.

Mullen, bankrupt, to quiet the title to the lands that had been conveyed to Mullen.

The Coline Oil Company answered and asserted its said lease, which covers all the lands, that is, the part conveyed to Mullen and the part conveyed to said Coline Oil Company.

Many reasons were alleged by plaintiff in his reply as to why he claimed said lease was invalid and no longer in force and effect. For the sake of brevity we will not set them out here further than to say one of the reasons asserted was that when Coline Oil Company acquired said lease by assignment from Hodges, said lease, in so far as it covered said 640 acres, merged into the fee title to said 640 acres, which was then held by Coline Oil Company.

The trial court made a general finding in favor of plaintiff and quieted the title to said lands, thereby wiping out said lease in so far as it covered the Mullen lands.

The opinion filed in this cause affirms the judgment of the lower court. The only question decided is that of merger. The opinion holds that when the Coline Oil Company acquired said lease by assignment, said lease, in so far as it covered said 640 acres, merged and was swallowed up in the fee title to the said 640 acres, and left said lease effective only as to the Mullen lands. It then holds that, since oil was not being produced from the Mullen lands at the expiration of said primary term of ten years, the lease automatically and of its own terms then expired.

Hereafter defendant in error will be referred to as plaintiff and the plaintiff in error as defendant, as these are the positions they held in the court below. Merger was first brought into this case by plaintiff's reply to defendant's answer. Defendant contends in its brief, first, that merger did not occur, and second, that even if it did, that did not affect defendant's lease.

Defendant in its petition for rehearing again asserts that even if such merger did occur (which it does not concede and expressly disagrees with the majority opinion in that respect), it did not affect defendant's lease as to the Mullen lands, nor cause it to expire at the end of the primary term of ten years, provided oil was being produced in paying quantities from any part of the lands described in the lease; that oil was being produced in paying quantities from the 640 acres, and that such lands are described in the lease is not even questioned.

The lease by its own express terms and provisions provides when and how it will terminate, or, to put it the other way, it expressly provides how long it will continue in force. Section 1, article 1 of the lease, in part, reads as follows:

"To have and to hold the same from the date of the execution hereof for a period of ten years and as long thereafter as oil or gas may be found in paying quantities on said premises."

The description of the lands embraced in said lease immediately precedes the above quoted language. Now, "on said premises" means on any part of the lands described in said lease, and no amount of reasoning as to the theory or fiction of merger can change it. This court cannot change it without writing a new contract, and that it cannot do. This later rule is recognized by the writer of the majority opinion, as will appear at page 10 thereof. An attempt is made to avoid the rule by saying that the situation is one that arose by operation of law. The attempted explanation, in my opinion, is not sound. Neither the law nor the courts can rewrite this contract. There was nothing unlawful about it, and it was one the parties had a right to make. They had a right to continue this lease in force after the ten-year term upon any lawful condition or contingency they might choose. They selected one of their own choosing. They provided it should continue for ten years and as long thereafter as oil or gas may be found in paying quantities on such premises,—not only the Mullen lands and not alone those conveyed to the Coline Oil Company, but on any part of the premises described in the lease. Suppose they had selected some other lawful condition to continue it in force. Suppose they had provided that it should continue in force so long as oil or gas should be produced from some other tract of land (designating it) not covered by the lease. Would this court say that it, or the law, could rewrite the contract in that respect? Certainly not. Then equally so it has no authority to rewrite the provision for the term of this lease. That being the situation, the question of merger of the lease and the fee title as to the 640 acres had nothing to do with its terms as to the Mullen land. To further safeguard against any contention to the contrary, the parties expressly provide in the lease (section 7, article 3) as follows:

"If the lessor shall in the future sell and transfer any of the above-described premises, the terms and conditions of this lease, and each and every part thereof, shall run with such part of such land so transferred, and be binding upon the grantees therein named."

In short, that provides that if the lessor shall convey any part of the lands described in the lease, the terms and conditions in the lease, and each and every part thereof, shall run with such lands and bind the grantees thereof.

Article 3 of the lease provides that lessee is not required to maintain continuous production or operation, and that the leasehold should not be considered abandoned "unless the lessee shall have ceased to operate thereunder as to all of the wells then in existence for an unbroken period of two years at any one time, and the drilling of additional wells shall extend the lease for an equal period."

Now, construing these clauses of the lease together, we have an oil and gas lease granting to the lessee the right to remove any and all oil and gas from any portion or all of said leasehold estate for a period of ten years and as long thereafter as oil or gas may be found in paying quantities on said premises and that the leasehold shall not be considered as abandoned, unless the lessee shall have ceased to operate thereunder as to all of the wells then in existence for an unbroken period of two years at any one time, and the drilling of additional wells shall extend the lease for an equal period; and if the lessor shall in the future sell and transfer any of the above-described premises, the terms and conditions of this lease, and each and every part thereof, shall run with such part of such land so transferred, and be binding upon the grantees therein named.

The above-mentioned covenants were in the special oil and gas lease executed and delivered by Cottingham, lessor, to Hodges on July 30, 1913. On May 24, 1915, Cottingham conveyed to J. S. Mullen, expressly subject to said lease, all of said lands, except 640 acres. Mullen accepted the deed with that express exception or reservation stated in the deed, and it being further stated in the deed that he as grantee took title subject to all the terms, provisions, and conditions of said oil and gas lease. Mullen was adjudicated a bankrupt and Hal M. Cannon, trustee of the estate of J. S. Mullen, a bankrupt, has just such rights as Mullen had and no more.

On November 17, 1915, Cottingham conveyed to Coline Oil Company expressly subject to said lease, said remaining 640 acres.

It is not claimed that lessee has ever ceased to operate, under the lease, the wells in existence at the time said lease was executed, and the undisputed evidence shows that at the time this action was commenced the Coline Oil Company, as assignee of said oil and gas lease, was drilling a well on the acreage conveyed to Mullen, and that said well and two additional wells have since been completed on that portion of said leased premises which subsequent to the date of the lease was conveyed to Mullen, expressly subject to the terms of the lease.

The majority opinion recognizes the fact that this court must construe the lease as the court finds it, and cannot make a new lease for the parties.

Under this state of the record, I am of the opinion that the majority opinion does not announce the correct rule of law wherein the court holds that the lease on the Mullen land will be considered as abandoned for failure to develop the same for oil and gas prior to the expiration of the ten-year period, for such a holding is not in accordance with the plain terms of the lease.

This is not the usual form of an oil and gas lease. Mullen took title expressly subject to this lease, and, according to his own testimony, he received a substantial reduction in consideration for doing so. He took title expressly subject to, among others, the provision that the lease continue so long as oil or gas be found in paying quantities on any part of the 1,900 acres, described in the lease. This lease, by its own terms, is to continue so long as oil or gas may be found in paying quantities on any of the lands described in the lease, regardless of any question of merger. The provision, as to the term of this lease, is a fundamental and controlling question as to whether or not it has expired by its own terms. The majority opinion holds that it is the contention of plaintiff in error that the lease continued thereafter, meaning after ten years, from the fact that oil and gas were being produced in paying quantities under and by virtue of the lease. As I read the brief, this is not the contention of the plaintiff in error in its brief nor in its petition for rehearing. It is the contention of plaintiff in error that it makes no difference whether oil and gas be considered as produced under and by virtue of the lease or not, so long as it is produced on said premises described in the lease. In other words, defendant contends that if it should, by some theory or fiction, be held that the plaintiff in error produced the oil from the 640 acres, under and by virtue of its fee title and not under and by virtue of the lease, that would not be decisive of the case because, as stated by plaintiff in error, the lease is to continue in force so long as oil or gas is produced from said

premises described in the lease, not how, nor by what right it is produced, but the fact that it is produced.

Under the lease in this case, no rentals nor royalties were to be paid. No one other than plaintiff in error was interested in the production. Mullen understood that when he took title, Hal M. Cannon, trustee of the estate of J. S. Mullen, bankrupt, upon Mullen being adjudged a bankrupt, stepped into Mullen's shoes and has no greater rights than Mullen had. This court and many others have repeatedly held that, under an extension clause of an oil and gas lease, production in paying quantities from any part of the lands covered by the lease keeps the lease alive as to all lands covered thereby. This is true even though the ownership of the land ·has been split up and likewise the ownership of the lease.

In Gypsy Oil Co. v. Cover, 78 Okla. 158, 189 Pac. 540, it is said:

"The plaintiffs' next contention is that the lease as to the 120 acres terminated before the bringing of this action for failure to drill and operate the premises according to the terms of the lease, or was subject to forfeiture for failure to develop.

"It is admitted that one producing well was put down by Davis and the Producers Oil Company within one year from the date of the lease; also, that no well was drilled on the 120-acre tract nor rentals paid. This court held, in the case of Roach v. Junction Oil & Gas Company, 72 Okla. 213, 179 Pac. 935, that after gas was found upon the leased premises within five years from date thereof in ,paying quantities, the lessee thereby became vested with a limited estate in the leased premises for further operations in accordance with the terms of the lease (citing Brennan v. Hunter, 68 Okla. 112, 172 Pac. 49, citing numerous cases). In Pierce Oil Corporation v. Schacht, 75 Okla. 101, 181 Pac. 731, it was held that where a lease covered a tract of 160 acres and an assignment was thereafter made to 40 acres, upon which a gas well was brought in and the royalties paid, from that time 'on there would be no indebtedness for future rentals, * * * and this would not only apply to the portion of the land where the gas well was situated, but to the land in its entirety, and the payment of said stipulated royalties continued the lease in force and effect as to the entire 160 acres of land."

To the same effect are Pierce Oil Corporation v. Schacht, 75 Okla. 101, 181 Pac. 731; Blackwell Oil & Gas Co. v. Whited, 81 Okla. 45, 196 Pac. 688; Douthitt v. Wheeler, 110 Okla. 131, 236 Pac. 408; McAllister v. Texas Co. (Tex. Civ. App.) 223 S. W. 859; South Penn Oil Co. v. Snodgrass (W. Va.) 76

S. E. 961; Nabors Oil & Gas Co. v. McCormick (La.) 81 So. 766; Harness v. Eastern Oil Co. (W. Va.) 38 S. E. 662; Thornton on Oil and Gas (3rd Ed.) sec. 920.

This is not an action brought by the defendant in error to cancel the lease for failure to continue development within a reasonable time after the discovery of oil or to prosecute development diligently or for failure to drill an offset well, as provided for in some oil and gas leases.

It is the contention of the defendant in error that, because the well was not commenced on the land conveyed by Cottingham to Mullen within ten years after the date of the lease, when Hodges assigned the lease to Coline Oil Company on March 8, 1916, it merged with the title which Cottingham conveyed to Coline Oil Company on November 17, 1915, and the majority opinion sustains the contention of the defendant in error, and with this view, taken by the court, we cannot agree, and the authorities cited in the opinion do not sustain the rule announced by the majority opinion.

The first case cited with approval in the majority opinion is Boykin v. Ancrum, 28 S. C. 486, 6 S. E. 305, 13 Am. St. Rep. 698. The third paragraph of the syllabus reads:

"Merger is the annihilation of one estate in another, and takes place usually when a greater ·estate and a less coincide and meet in one and the same person, without any intermediate estate, whereby the less is immediately merged; that is, sunk or drowned in the greater."

These two estates could not possibly coincide and meet in the Coline Oil Company, because the Coline Oil Company never owned the whole of the fee title, subject to the lease of the entire acreage, but only owned the fee title to 640 acres, and the remainder of the fee title, subject to the oil and gas lease, was conveyed to Mullen. The New Century Dictionary defines "coincide" thus: "To occupy the same place in space, the same point or period in time, or the same relative position." Webster defines "coincide": "To occupy the same place in space, as two congruent triangles placed one on the other."

If the Coline Oil Company had purchased from Cottingham 640 acres of land subject to an oil and gas lease, and later the oil and gas lease on the 640 acres of land was conveyed to Coline Oil Company, the two estates might coincide and meet in one and the same person, depending upon the circumstances as to whether or not there was any intermediate estate, or would it be to the manifest interest of the owner for the

two estates to merge. Under such conditions, the two estates might merge, but I am of the opinion that it is an impossibility for one estate such as an oil and gas lease on 1,900 acres of land to coincide and meet in the same person on 640 acres of land. We might as well try to drown a 200-pound man in a two gallon pail of water, or hold that Jonah swallowed the whale instead of agreeing that the whale swallowed Jonah.

The majority opinion also approves the holding in the case of Hill v. Reno, 112 Ill. 154. The syllabus of that case is:

"A lessee of lands, the reversion in fee of which is in tenants in common, may upon purchasing a part of the reversion demand a partition even though it will necessarily result in a sale of the premises."

This case has no bearing whatever in the case at bar. The majority opinion states that the doctrine of merger is recognized in respect to oil and gas leases. Citing Thornton's Law on Oil & Gas (4th Ed.) 206, sec. 69. The writer of the text cites in support thereof, State v. Coosaw Mining Co., 47 Fed. 225; Fairchild v. Dunbar Furnace Co. (Pa.) 18 Atl. 443. The first cited case holds:

"Act S. C. 1870 gave defendant the right to mine phosphate in the Coosaw river for 21 years on the condition that it should pay annually $1 a ton for each ton mined, and make annual return of its operations, or oftener if required. Act of 1876 proposed certain modifications of this contract as regards time and manner of making returns, payment, etc., and provided that on defendant's acceptance thereof its right to mine should become exclusive, and it should have the right, 'so long as, and no longer than', the new conditions were complied with. Held, that these words applied only to the duration of the original term, and did not make the right perpetual."

The latter case holds that:

"A contract not under seal, whereby, for a consideration (afterwards paid), the owner of land agrees to 'grant the right and privilege of digging all the ore on his land,' is an equitable conveyance of the ore in fee, and not a mere license to take minerals, and trespass by the grantee of the owner will not lie against those claiming under such contract for removing ore from the land."

There are numerous other citations in the majority opinion from text-writers, all of which merely announce the strict common-law rule as to merger. And all the authorities cited under other sections of the text announce the general exception to the rule, that merger is not favored in equity and will only be allowed to promote the intention of the parties; and that equity will prevent a

merger when the same is not for the best interest of the grantee, or owner of the two estates.

This court in Yoder v. Robinson, 45 Okla. 165, 145 Pac. 775, quotes with approval from 2 Pomeroy's Equity Jurisprudence, sec. 788, as follows:

"Where the owner of the legal estate, as for example the fee, acquires by purchase or in any other manner, a lesser equitable estate not co-extensive and commensurate with his legal estate, a distinction exists; the merger, although taking place at law, does not necessarily take place in equity; indeed, it may be said that the leaning of equity is then against any merger, and that prima facie it does not result. The settled rule in equity is that the intention of the one acquiring the two interests then controls. If this intention has been expressed by taking the transfer to a trustee, or by language inserted in the instrument of transfer, it will, of course, be followed. If the intention has not been thus expressed, it will be sought for and ascertained in all the circumstances of the transaction. If it appears from all these circumstances to be for the benefit of the party acquiring both interests that a merger shall not take place, but that the equitable or lesser estate be kept alive, then his intention that such a result should follow will be presumed, and equity will carry it into execution by preventing a merger, and by treating the equitable or lesser interest as subsisting, and by admitting all the consequences for the protection of the party with respect to other matters, which necessarily result from the fact of the equitable estate being left in existence."

In the case, Lashley v. Dexter, 133 Okla. 297, 272 Pac. 427, this court in an opinion by Commissioner Foster held:

"Where a junior mortgagee, who is also owner of first mortgage interest coupons, which are a lien upon the property superior to the lien of the first mortgage holder, causes the land to be sold upon a foreclosure of his junior mortgage, and purchases the same at execution sale, taking title in the name of a trustee, his lien under the first mortgage coupons does not become merged with his title at the execution sale, unless there are facts and circumstances indicating an intention that a merger should take place."

The opinion approves the rule announced in Dubbels v. Thompson, 49 Mont. 550, 143 Pac. 986; Westheimer v. Thompson, 3 Idaho, 560, 32 Pac. 205; Anglo-Californian Bank, Limited, v. Field, 146 Cal. 644, 80 Pac. 1080.

In Dubbels v. Thompson, supra, the court said:

"As between the plaintiff and defendant Carl N. Thompson, the deed dated April 18,

1912, under the facts disclosed, did not extinguish the mortgage. It is a well-settled rule that, as between the parties, the result of such a transaction depends upon the intention which prompts it. This intention may be shown by the recitals in the deed itself, or by a separate agreement in writing, or it may be ascertained from parol evidence of the circumstances accompanying the transaction—such as that the mortgagee retains the evidences of the debt, having accepted the deed as additional security, or that he does not formally release the mortgage, or assigns it to a bona fide purchaser, representing that it is a valid, subsisting security. Gibson, Adm'x, v. Morris State Bank, 49 Mont. 60, 140 Pac. 76; Factors' & Traders' Ins. Co. v. Murphy, 111 U. S. 738," and other cases.

The Idaho court holds:

"Presumptions are against merger where it is manifestly for the interest of the grantee that the charge should not merge.

"When the grantee of mortgagor buys in and takes assignment of a mortgage upon the premises conveyed, the mortgage so purchased does not merge, except in the case when the grantee has assumed payment of the mortgage as part of the consideration for the conveyance of the fee, or has manifested or declared an intention to have it merge."

In Factors' & Traders' Ins. Co. v. Murphy, supra, the Supreme Court of the United States said:

"Where an incumbrancer, by mortgage or otherwise, becomes the owner of the legal title or of the equity of redemption, the merger of the incumbrance will not be held to take place if it be apparent that it was not the intention of the owner, or if, in the absence of any intention, such merger was against his manifest interest."

In the case at bar it would certainly be against the manifest interest of the Coline Oil Company for the oil and gas lease to merge with the fee title from Cottingham to Coline, as under the holding of the majority opinion it would operate as an abandonment of the oil and gas lease on the 640 acres of land conveyed by Cottingham to Mullen.

In the case of Anglo-Californian Bank, Limited, v. Fields, supra, the Supreme Court of California said:

"The merger of mortgage liens with the fee, on both being united in the same person, is a question of intent, and merger will not be implied where there is an intervening claim, but equity will keep the legal title and the mortgagee's interests separate, though held by the same person, whenever necessary for the full protection of his just rights; and if, from all the circumstances, a merger would be disadvantageous to the

party holding the fee, his intention that merger shall not result will be presumed and maintained, and equity will keep the liens alive for the purpose of doing justice."

In the case of Bodcaw Lumber Co. of Louisiana v. B. D. Goode, 254 S. W. 345, 29 A. L. R. 578, the Supreme Court of Arkansas said:

"The oil, gas and minerals underlying a tract of land may be severed by reservation in a grant of the surface so as to create a right in perpetuity in the grantor.

"A reservation which is part of the granting clause of a deed must be read in connection with the grant as a limitation thereon, rather than as being in conflict with it.

"In case of an attempted reservation or exception in a deed, the question is to determine what the real intention of the parties was with respect to the thing granted, so that if the intention to create an exception is clear when the word 'reserve' is used, that intent will be given effect.

"A provision in a deed of real estate 'reserving to the grantor,' his successors and assigns, all minerals and mineral rights in the land, will be construed as an attempt to except the mineral rights from the conveyance."

That decision quotes with approval Rich v. Doneghey, 71 Okla. 204, 177 Pac. 86, where this court said:

"But with respect to such oil and gas, they have certain rights, designated by the same courts as a qualified ownership thereof, but which may be more accurately stated as exclusive right, subject to legislative control against waste and the like, to erect structures on the surface of their land, and explore therefor by drilling wells through the underlying strata, and to take therefrom and reduce to possession, and thus acquire absolute title as personal property to such as might be found and obtained thereby. This right is the proper subject of sale, and may be granted or reserved."

In Williams v. Bricker, 109 Pac. 998, the Supreme Court of Kansas, in discussing when an estate for life (and not a lien or easement) will merge in the fee title, said:

"It is claimed, therefore, that with the execution of the deed the life estate and the vested remainder united in the same person and therefore merged together, and that the contingent remainder then expired, because there was no longer a life estate to which it could attach. This result would doubtless follow where the unmodified common law prevails. 16 Cyc. 656; 24 A. & E. Enc. of L. 413. It might, however, be seriously questioned whether it follows in Kansas, for this reason, among others: Here the union of two estates in one person does not necessarily result in a merger. Loan Associa-

tion v. Insurance Co., 74 Kan. 272, 86 Pac. 142; Shattuck v. Bank, 63 Kan. 443, 65 Pac. 643. The merging of two estates by their union in a single individual is purely a matter of theory. The two estates are conceived as remaining separate whenever that view is to the advantage of their holder. There is more reason that they should be kept apart when their merger would operate to the prejudice of one who is not a party to the transaction.

" 'At law, the rule that whenever a greater estate and a less coincide in the same person without an intermediate estate, the lesser is merged, is invariable and inflexible in equity, the rules of law as to merger are not fo.lowed, and the doctrine of merger is not favored. Equity will prevent or permit a merger as will best subserve the purposes of justice and the actual and just intent of the parties; whenever a merger would operate inequitably it will be prevented. * * * In equity, the merger will be prevented whenever necessary to protect the rights of an innocent third party, or of the person in whom the estates meet.' 16 Cyc. 665, 668.

" 'In equity the legal rule of merger is not regarded as inflexible, and the question whether the doctrine of merger will be applied or not is determined by the intention of the party in whom the estates unite, provided that his intention shall not be enforced to perpetrate fraud or wrong. * * * The equitable doctrine has superseded the legal doctrine almost entirely at this day; for in England the equitable doctrine controls in courts of law by statute, while in many of the United States equitable remedies can be had in courts of law.' 20 A. & E. Enc. of L. 590, 591."

In the case of Moore v. Luce, 29 Pa. 260, the Supreme Court of that state said:

"Merger takes place when a greater and a less estate come together in the same person, and when there is no reason for their longer existence as separate estates. The doctrine has its foundation in the convenience of the parties interested, and therefore, whenever the rights of strangers, not parties to the act that would otherwise work an extinguishment of the particular estate, require it, the two estates will still have a separate continuance in contemplation of law."

It will be noted, as announced in the Kansas case, that section 170, C. O. S. 1921, modifies the common-law doctrine, and is as follows:

"The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object."

Numerous other authorities might be cited in support of this proposition, but it seems to be settled by the former decision of this court that equity will prevent a merger, unless it is for the interest of the party in whom the two estates meet.

We do not feel that it is necessary to discuss servient estates, as that section of the statute has nothing to do with the leasehold estate involved in this action. Section 8438, C. O. S. 1921, is identical with section 2770, Comp. Laws of Dakota 1887, chapter 3, on servitudes.

A servient estate is an estate, or some use in the nature of an easement, on which another estate is dependent of necessity for enjoyment. Dillman v. Hoffman, 38 Wis. 559.

When one part of an estate is dependent, of necessity, for enjoyment on some use, in the nature of an easement, in another part, the former is the dominant, and the latter the servient, estate. Galloway v. Bonesteel (Wis.) 26 N. W. 262.

The term "servient estate," in the law of easements, is used to designate the estate in which another owns an easement. Stevens v. Dennett, 51 N. H. 324.

The servient estate is the one upon which the easement is imposed. Walker v. Clifford, 128 Ala. 67.

We do not want to be understood as holding that there are not instances in which, even though the two estates do not coincide, that there could be a pro tanto merger of the two estates, but they do not exist in cases like the one under consideration, and it is not necessary to discuss that subject here. We feel confident in saying there is not a well-considered case holding contrary to the early decision of the United States Supreme Court in Factors' & Traders' Ins. Co. v. Murphy, supra, which holds that merger will not be held to take place if it be apparent that it was not the intention of the owner of the two estates that they should merge, or if, in the absence of any intention, such merger was against his manifest interest.

It cannot be successfully contended in this case that it would not be against the manifest interest of the Coline Oil Company to hold that the law forced a merger of the two estates in the case under consideration, and such is the holding of the majority opinion.

I am therefore of the opinion that the

majority opinion is contrary to the former holdings of this court, as well as against the great weight of authority, hence this dissent.

---

ANDREWS, J. (dissenting). Majority opinion filed January 1, 1930. Upon consideration of the second petition for rehearing in this cause and further investigation of the issues presented by the appeal, I am unable to agree with the rule of law announced in the majority opinion, and I desire to briefly express my views.

The facts as disclosed by the record are that Cottingham owned a tract of real estate. He conveyed to Hodges the oil and gas thereunder for a term of ten years and as long thereafter as oil or gas might be found in paying quantities thereon. No delay money was to be paid. No royalty was to be paid. Cottingham conveyed a part of the land to the Coline Oil Company, subject to the oil and gas grant, and the remainder of the land to J. S. Mullen, subject to the oil and gas grant. Mullen became bankrupt and Hal M. Cannon was appointed trustee in bankruptcy.

This oil and gas grant cannot be considered an oil and gas mining lease. The grantor therein was to receive no portion of the oil or gas produced under the terms of the grant. He was to receive no rental or delay money thereunder. If oil or gas was produced during the term of the grant, it was to belong to the grantee and the grantor was to have no interest therein.

Thereafter the Coline Oil Company purchased the oil and gas grant and took an assignment thereof. At the expiration of the ten-year term oil was being produced from that portion of the land that had been deeded to the Coline Oil Company and arrangements were being made to drill on that portion of the land held by Hal M. Cannon, trustee.

The opinion holds that the purchase by the Coline Oil Company of the oil and gas grant on the entire tract while the Coline Oil Company was the owner of a portion of the tract constituted a merger and that the production of oil from that portion of the tract owned by the Coline Oil Company did not continue the term of the oil and gas grant as to that portion of the tract owned by Hal M. Cannon, trustee. I am unable to agree with that theory of the law.

In effect that holding amounts to this:

I buy a part of a tract of land subject to an oil and gas grant. The part that I buy is developed for oil and produces oil.

Desiring to procure the oil produced from the land I own, I buy the oil and gas grant on the entire tract. The minute I acquire title to the oil and gas grant I lose the title to that portion thereof covering the land other than that portion that I own in fee. That cannot be the law. For that reason, I dissent.